UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

IN RE META MATERIALS INC. SECURITIES
LITIGATION

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
21-cv-7203 (CBA) (JRC)

-----------------------------------------------------------x

**AMON, United States District Judge:**

This consolidated securities class action is brought on behalf of all persons and entities who purchased Meta Materials Inc.'s publicly traded securities between September 21, 2020 and June 24, 2022 (the "Class Period"). The defendants include Meta Materials, Inc. ("Meta Materials" or "Meta"), formerly known as Torchlight Energy Resources, Inc. ("Torchlight"), and several of Meta and Torchlight's current and former officers and directors, specifically, George Palikaras, Kenneth Rice, Greg McCabe, and John Brda (the "Individual Defendants," and, collectively with Meta, "Defendants").

The putative class brings claims under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a), and Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77o. (ECF Docket Entry ("D.E.") # 46 ("Amended Complaint" or "Compl.").) Defendants move to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(b) (the "PSLRA"), arguing that the Amended Complaint does not satisfy heightened pleading requirements and fails to plead actionable misstatements or omissions. (D.E. # 51 (Notice of Motion); D.E. # 52 ("Defs.' Mem.").) For the reasons set forth below, Defendants' motion to dismiss is GRANTED.

1

## BACKGROUND

The following facts are drawn from the allegations in the Amended Complaint, which are taken as true at this stage of the litigation. See DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 110-11 (2d Cir. 2010). I may also consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken." Bd. of Trs. of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO, 811 F. Supp. 2d 853, 865 (S.D.N.Y. 2011), aff'd sub nom., Frederick v. Mechel OAO, 475 F. App'x 353 (2d Cir. 2012).

### I.  Factual Background

#### A.  Relevant Parties and Entities

Plaintiffs, including lead plaintiffs Kaoutar Kajjame, Philip Granite, Ricardo Joseph, Venkateswara Ramireddy, Todd Targgart, and Michael Schultheis, are persons and entities who purchased Meta Materials stock during the Class Period. (Compl. ¶ 1.)

Meta was formed in 2021 as the result of a reverse merger between Metamaterial Technologies Inc. ("Metamaterial"), a Canadian company whose stock traded on the Canadian Securities Exchange, and Torchlight, a Nevada oil and gas company that was listed on NASDAQ. (Defs.' Mem. 2-3; Compl. ¶¶ 2, 39.) Prior to the merger, the Individual Defendants held the following positions: Brda was Torchlight's President and Chief Executive Officer ("CEO"), McCabe was Torchlight's Chairman and largest individual shareholder, Palikaras was Metamaterial's CEO, and Rice was Metamaterial's Chief Financial Officer ("CFO") and Executive Vice President ("EVP"). (Compl. ¶¶ 4, 20-23.) Following the merger, Brda and

2

McCabe resigned, (id. ¶¶ 22-23), and Palikaras and Rice became Meta's CEO and CFO/EVP, respectively, (id. ¶¶ 20-21).

### B. Pre-Merger Operations and Product Concepts

When Metamaterial began operations in 2011, it focused on developing transparent thin films ("TTFs") for the solar, LED light, and laser protection markets. (Id. ¶ 31.) Its operations were divided into three segments focusing on those markets: Lamda Solar, Lamda Lux, and Lamda Guard. (Id.) Metamaterial added two additional segments for lithography[1] and wireless sensing applications in 2016 and 2018, respectively. (Id. ¶¶ 57, 59.)

As to Lamda Solar, Metamaterial's website claimed in 2016 that "TTFs for solar cells were in the final stage of development." (Id. ¶ 32.) Then, in 2017, Metamaterial changed course and announced that it was changing the design of its solar TTFs to use "NanoWeb technology," which Metamaterial acquired from a company called Rolith in mid-2016. (Id. ¶¶ 31-32, 57.) Metamaterial announced the change alongside news of a C$5.6 million investment by Lockheed Martin, in which Metamaterial would produce a prototype of a product called "metaSOLAR," described as "the world's lightest weight and highest efficiency solar panel technology, suitable for flight." (Id. ¶¶ 36-37.) Although Metamaterial used the language of "partnership," the terms of the agreement explicitly disclaimed a legal partnership. (Id. ¶ 36.) To date, there is no evidence that Metamaterial has developed a solar flight TTF or prototype. (Id. ¶ 37.) Similarly, the Lamda Lux segment has never produced a product. (Id. ¶ 51.)

As to Lamda Guard, Metamaterial began developing a TTF for use in aviation; specifically, a TTF that selectively blocks certain light frequencies and can be adhesively applied to surfaces

---

[1] "Lithography is a process used in the fabrication of integrated circuits, in which a light-sensitive polymer, photoresist, is exposed and developed to form 3D relief images on the substrate, typically a silicon wafer of up to 11.8 inches in diameter." (Compl. ¶ 57.)

like cockpit windows to protect pilots from "laser glare." (Id. ¶ 52.) In 2014, Metamaterial announced a signed agreement with Airbus (a leading aerospace company) to test its design. (Id.) In 2017, Airbus and Metamaterial executed another agreement for Metamaterial to "validate, certify, and commercialize" the laser glare technology. (Id. ¶ 53.) However, in 2018, Metamaterial shifted from windshield protection toward "eyewear and visors" and launched a laser-glare protected ("LGP") product called metaAIR. (Id. ¶¶ 52-54.) Metamaterial entered into a $1 million agreement with Satair, an Airbus subsidiary handling parts and equipment distribution, to exclusively distribute metaAIR LGP eyewear and visors to aviation and military markets. (Id. ¶¶ 53-54.) Metamaterial ultimately produced a small number of the metaAIR LGP glasses, but Plaintiffs allege the company never advanced the product to wide-scale commercialization because the glasses lacked features provided by cheaper competitor products. (Id. ¶¶ 56, 123.) According to a confidential witness employed as a Production Technician, referred to as "FE1," Metamaterial's facilities were not equipped for production at commercial levels at least until the end of FE1's tenure, in May 2022. (Id. ¶¶ 61, 104.) Metamaterial's public securities filings in Canada reflect that there had been no activity within the Lamda Solar, Lamda Lux, and Lamda Guard segments during the three years prior to March 2020. (Id. ¶¶ 50-51.)

Metamaterial's lithography segment, added in 2016, consisted of the NanoWeb technology the company initially used in connection with Lamda Solar. (Id. ¶ 57.) NanoWeb is a conductive TTF that has the potential to be used in applications such as touch screens and car windshields. (Id.) Since acquiring NanoWeb, the company has failed to adequately develop the technology for commercialization, and Meta allowed the license for a patent necessary to produce NanoWeb products to lapse. (Id. ¶ 58.) The wireless sensing segment was created in July 2018 upon Metamaterial's acquisition of MediWise. (Id. ¶ 59.) Metamaterial purchased MediWise from

Palikaras and his wife for C$4.7 million, and the acquisition involved a forgiven intercompany loan for C$700,000. (Id. ¶¶ 59-60.) MediWise's core product was "glucoWise," a non-invasive, "glucose-sensing platform" touted as able to read blood glucose levels through the skin barrier without the need for blood. (Id. ¶ 59.) Plaintiffs allege that the clinical literature suggests it would be "literally impossible" for the mechanism underlying glucoWISE to function as described. (Id. ¶¶ 60, 83.)

Without commercial products or other means to generate revenue, Metamaterial used loans and grants to sustain its operations. (See, e.g., id. ¶¶ 33-38.) In total, since Metamaterial's inception in 2011 through September 2020, the company secured C$60 million in funding. (Id. ¶ 40.) As of December 2020, Metamaterial had a deficit of more than $52 million and was in breach of a debt covenant with one of its debtholders. (Id. ¶ 205.)

At the time of the merger, Torchlight, for its part, was "on the brink of insolvency" and its executives were looking for a way out. (Id. ¶ 2; D.E. # 55 ("Opp'n") 7.) The company had accumulated losses of nearly $100 million and according to SEC filings, had "substantial doubt[s] about [its] ability to continue as a going concern." (Compl. ¶ 28.) Brda, Torchlight's CEO, had seen his compensation decline dramatically over the five years prior to the merger, and nearly 40% of his salary was "accrue[d] unpaid," meaning that he would not receive it until management believed the company had adequate cash or Torchlight experienced a "change in control." (Id. ¶ 194.) Brda's compensation agreement also provided for early vesting of stock options upon a change in control and a $1.5 million bonus payment. (Id. ¶¶ 195-96.) As Torchlight's largest individual shareholder, McCabe had invested millions of dollars into the company, including by transferring majority interests in large oil and gas projects and providing interest-free loans. (Id. ¶ 200.)

## C. Announcement of the Reverse Merger

The Class Period begins on September 21, 2020, when Metamaterial announced an agreement to be acquired by Torchlight. (Id. ¶¶ 90-91.) Torchlight agreed to acquire all of Metamaterial's shares and then list on NASDAQ under the ticker symbol "MMAT." (Id. ¶¶ 19, 46.) The combined entity, Meta Materials, would focus on Metamaterial's existing business. (Id. ¶¶ 90-91, 128.) The merger agreement also provided for Torchlight's legacy stockholders (including, in large part, McCabe) to exclusively receive the value of Torchlight's existing oil and gas assets if Meta disposed of them. (Id. ¶ 202.)

The merger allowed Metamaterial to be listed on NASDAQ, and therefore created an opportunity for an immediate capital infusion, and Torchlight to stave off bankruptcy and avoid significant officer and shareholder losses. (See id. ¶¶ 193-95, 200, 206.) When the merger was announced, "[t]he market was skeptical of the transaction due to the fact that Metamaterial had not been successful in bringing any products to market and had, in fact, cultivated a long list of product and development failures."[2] (Id. ¶ 49; see also id. ¶¶ 50, 63, 75, 217.)

## D. June 2021 At-the-Market Offering and Reverse Merger Closing

Pursuant to the merger agreement, Torchlight conducted several capital raises in the form of public offerings and at-the-market ("ATM") equity offerings. (Id. ¶ 69.) In February 2021, Torchlight announced a public offering for 23 million shares and used the net proceeds for general business purposes and to provide bridge financing to Metamaterial in connection with the merger. (Id. ¶ 70.) Then, on June 21, 2021, Torchlight conducted an ATM offering with an aggregate price of up to $100 million. (Id. ¶ 71.) The merger closed on June 28, 2021. (Id.)

---

[2] "Skepticism over the transaction grew" in March 2021, when the SEC issued a letter to Torchlight regarding its inadequate disclosures related to the merger and the exchange ratio between Metamaterial and Torchlight shares. (Compl. ¶¶ 63-64.)

### E. Alleged Misstatements

While Metamaterial and Torchlight were negotiating the merger, and afterwards, Plaintiffs allege that Defendants made materially false or misleading statements. Those statements can be generally grouped into two categories: (1) the status of Meta's products in terms of development, commercialization, and scalability, and (2) Meta's business relationships with Lockheed Martin and Airbus.

### 1. Development Status of Meta's Technologies and Products

Throughout the Class Period, Defendants made statements describing Metamaterial's core technologies in holography, lithography, and wireless sensing, and the products and product concepts utilizing those technologies.

First, Plaintiffs allege that in press releases, Defendants made misstatements designed to generate support for the merger and the combined company, Meta:

- "The combined entity will continue to service a clientele of world-class [original equipment manufacturer] customers for a range of applications in the automotive, aerospace and defense, energy, consumer electronics and medical markets." (Compl. ¶ 91 (September 21, 2020 press release).)

- "META's management, led by George Palikaras has built an extraordinary award-winning cleantech company whose *proprietary advanced technologies address multiple markets* and improve their customer's capabilities." (Id.; see also id. ¶ 102 (December 14, 2020 press release).)[3]

- "Metamaterial offers *proven disruptive technology* with strong environmental, social and governance (ESG) priorities. This Transaction provides our shareholders with *access to the multibillion-dollar markets that Metamaterial serves* and new applications that are being revolutionized with their sustainable technologies . . . ." (Id. ¶ 102 (December 14, 2020 press release).)

- "*META successfully pioneered laser and security eyeglass filtering*, to combat powerful pen pointers, for our customers like Airbus." (Id. ¶ 106 (February 2, 2021 press release).)

---

[3] Where portions of the quoted material appear in bold italics, the emphasis is in the Amended Complaint.

- "During previous published human studies, wearable metamaterial films have been demonstrated to help boost these signals by up to 240%, significantly enhancing the accuracy of the system. The team aims to continue the development and is in discussions with strategic partners who can accelerate the commercialization." (Id. ¶ 128 (July 6, 2021 press release).)

- "*META has developed a metamaterial technology platform to measure physiological signals with superior accuracy, specificity, and sensitivity*. META's technology leverages metamaterials to bend light in non-ordinary ways. When a metamaterial film is placed on the skin, the signal can penetrate the tissue, improving sensing accuracy." (Id. ¶ 176 (May 25, 2022).)

- "*META has demonstrated and published the effectiveness of metamaterial technology in both imaging and sensing applications*. I am personally excited about how this technology will make a difference in people's lives." (Id.)

These statements were false and/or misleading, according to Plaintiffs, because they created "the false perception that Metamaterial was an advanced company with proven products just a step away from disruption and profitability." (Id. ¶ 48.)

Second, Plaintiffs allege misstatements made in the Torchlight Proxy Statement ("the Proxy") (filed May 7, 2021 and incorporated by reference in the Registration Statement[4]):

- "On March 28, 2013, Meta incorporated Lamda Guard Inc., Lamda Lux Inc., and Lamda Solar Inc., under the federal laws of Canada, as wholly-owned subsidiaries of Meta. These subsidiaries have minimal operational activity." (Id. ¶ 275.)

- "Meta has many product concepts currently in different stages of development with multiple customers in diverse market verticals. Meta's business model is to co-develop innovative products or applications with industry leaders that add value. This approach enables Meta to understand market dynamics and ensure the relevance and need for Meta's products." (Id. ¶ 277.)

- "Meta co-developed its metaAIR laser protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using Meta's holography technology. metaAIR® is a holographic optical filter developed using nano-patterned designs that block and deflect specific colors or wavelengths of light." (Id. ¶ 280.)

---

[4] The Registration Statement is defined by both parties as Torchlight's Form S-3, filed May 28, 2021, and the prospectus supplements filed June 16, 2021 and June 21, 2021. (See Compl. ¶ 259.)

- "Meta's current principal prototype product in lithography technology is its transparent conductive film, NanoWeb®. The lithography division operates out of Meta's wholly owned U.S. subsidiary, which can produce meter-long samples of NanoWeb®, at a small volumes scale, for industry customers/partners. There are six NanoWeb®-enabled products and applications that are currently in early stages of development including NanoWeb® for Transparent EMI Shielding, NanoWeb® for 5G signal enhancement, NanoWeb Transparent Antennas, NanoWeb® for Touch Screen Sensors, NanoWeb® for Solar cells and NanoWeb® for Transparent Heating to de-ice and de-fog. Currently these products are in the design and prototyping phase and Meta is performing market trials with potential customers." (Id. ¶ 283.)

- "This breakthrough wireless sensing technology is made using proprietary patterned designs, printed on metal-dielectric structures on flexible substrates that act as anti-reflection (impedance-matching) coatings when placed over the human skin in combination with medical diagnostic modalities, such as MRI, ultrasound systems, non-invasive glucometers etc." (Id. ¶ 285.)

- "In Q1 2019, Meta completed the setup of its metaAIR® eyewear production facility and started providing its eyewear to several airlines for in-market flight tests through its distributor, Satair (an Airbus Company). *Meta sold 50 units during 2019 and it is further increasing its reach to airlines through Airbus and Satair*." (Id. ¶ 287.)

Third, Plaintiffs allege that in a June 28, 2021 shareholder letter and April 25, 2022 fact sheet, Defendants stated:

- "META *delivers previously unachievable performance*, across a range of applications, by inventing, designing, developing, and manufacturing sustainable, highly functional smart materials. Our technology platform encompasses *three core capabilities*, holography, lithography, and wireless sensing, and is software and AI-design driven." (Id. ¶¶ 121, 146.)

- "We enable leading global brands to deliver breakthrough products to their customers in consumer electronics, 5G communications, health and wellness, aerospace, automotive, and clean energy." (Id. ¶ 146.)

Fourth, in a May 2022 investor presentation, Defendants included a slide titled "Technology Platform Capabilities," which listed Meta's core technologies, and, for each technology, products and/or applications. (Id. ¶ 154.) For example, under holography, "metaAIR laser glare protection" is listed, under lithography, NanoWeb is listed, and under wireless sensing, "glucoWISE non-invasive glucose monitor" is listed. (Id.; see also id. ¶ 147 (same slide in April 2022 fact sheet).)

Finally, on several occasions between February 8, 2021 and June 10, 2022,[5] Defendants allegedly made the following misstatements:

- "Meta has generated a portfolio of intellectual property and is ***now moving toward commercializing products*** at a performance and price point combination that has the potential to be disruptive in multiple market verticals." (Id. ¶ 109.)

- "Meta's advanced structural design technologies and ***scalable manufacturing methods*** provide a path to broad commercial opportunities in aerospace, medical, automotive, energy and other industries." (Id.)

These statements were false and/or misleading, according to Plaintiffs, because they misrepresented the development and commercialization status of Meta's products, whether those products worked or were scientifically proven, and whether Meta had existing and if so, multiple, customers in different markets.

### 2. Meta's Business Relationships

Defendants also allegedly made a series of misstatements concerning Metamaterial's relationship to established companies like Lockheed Martin and Airbus:

- "In 2018 META was awarded 'Best New Product in Commercial Aviation' by Aviation Week Network at the 63rd Annual Laureate Awards, for metaAIR®, a Laser Strike Protection solution to protect pilots from harmful laser attacks without interfering with visibility. ***META partnered with Airbus to develop and commercialize this technology.***" (Id. ¶ 91 (September 21, 2020 press release).)

- "***META has also partnered with Lockheed Martin*** and the Canadian Government's Sustainable Development Technology Canada (SDTC) fund to develop metaSOLAR™ a new solar energy product suitable for the transportation industry." (Id.)

- Defendants listed Lockheed Martin and Airbus in a list of Meta's "corporate partners, some of whom have also invested in META." (Id. ¶ 97 (November 30, 2020 shareholder letter).)

- "Meta co-developed its METAAIR® laser protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using Meta's holography technology. METAAIR® is a holographic optical filter developed

---

[5] (See Compl. ¶109 (February 2021 Prospectus); ¶ 113 (May 2021 Proxy); ¶ 117 (June 2021 Prospectus to Registration Statement); ¶ 142 (2021 Form 10-K); ¶ 161 (2021 Amended Form 10-K); ¶¶ 131, 138, 165 (Form 10-Qs filed August 13, 2021, November 15, 2021, and May 10, 2022, respectively); ¶ 161 (2022 Form 10-K/A); ¶ 179 (June 2022 Prospectus).)

using nano-patterned designs that block and deflect specific colors or wavelengths of light." (Id. ¶ 134 (August 13, 2021 Quarterly Report, Form 10-Q).)

- *"**The Company has co-developed this product with Airbus through a strategic partnership**. Airbus further extended its support by introducing the Company to Satair, an Airbus owned company, which became the global distribution partner for METAAIR® to the aviation market. **Since 2016, Airbus and Satair invested a total of $2,000,000 for the product development and exclusive distribution rights**."* (Id.)

### F. Post-Merger Corrective Disclosures

A few months after the merger closed, Meta received a subpoena from the SEC Division of Enforcement, as reflected in the company's quarterly report filed in November 2021. (Id. ¶ 72.) Meta disclosed that the subpoena requested "information related to, among other things, the [Torchlight] merger." (Id.) In response to this news, Meta's stock price fell 3.9%. (Id. ¶ 73.)

In December 2021, Kerrisdale Capital, a short-seller firm, published a report (the "Kerrisdale Report" or the "Report") opining that Meta's business "is comprised of a whole lot of nothing: no real revenue, no promising technologies, undeveloped products, no track record of achievement" and "is a collection of disjointed and failed laboratory experiments designed . . . to fuel a stock promotion scheme." (D.E. # 53 ("Rowe Decl.") Ex. H at 1.[6]) Plaintiffs allege that "for investors who were already skeptical of Meta Materials and the merger, the Kerrisdale Report simply reaffirmed how Meta Materials habitually made outlandish and misleading claims about the feasibility, development, and commercial potential of various technologies[.]" (Compl. ¶ 75 (internal quotation marks and citation omitted).) The Report revealed the "dismal failure of LGP glasses," "outright falsehoods being told to promote non-existent medical devices," and that Meta had ceased licensing a patent critical to the NanoWeb production process. (Id. ¶ 77.) According to the Report, the lack of license suggested that Meta "has no intention of ever commercializing NanoWeb at all." (Id. ¶ 78.)

---

[6] Hereinafter, all documents cited as "Ex. __" refer to exhibits to the Rowe Declaration.

The Report also revealed that Palikaras and his wife owned roughly 50% of MediWise, that the product "glucoWISE" did not exist, and moreover, that no non-invasive glucose-sensing system existed at the time it was published. (Id. ¶ 83.) In sum, the Report argued that Meta's "track record" was to promote products that "either don't exist or are grossly overstated, the underlying scientific effort is a sham, and all of it is enmeshed in a complicated series of financial transactions that seem more related to enriching management than developing any profitable business." (Id.) Following the Report's publication, Meta's stock price dropped 5.8%. (Id. ¶ 85.)

Most recently, in June 2022, Meta held another offering with certain institutional investors that resulted in net proceeds of $46.3 million. (Id. ¶ 209.) Meta intended to use the vast majority of the proceeds for "general corporate purposes," which allegedly does not include investment for "vital research and development necessary to commercialize a product." (Id. ¶¶ 209-10.) Accordingly, Plaintiffs allege that Meta has continued to use cash infusions "to stay afloat long enough to create enough hype for its next capital raise" and "perpetuat[e] a cycle of fraudulent conduct that leaves its investors with increasingly diluted ownership." (Id. ¶ 211.)

## II. Procedural History

The complaint for this putative securities class action was initially filed in January 2022, shortly after the Report was published. (D.E. # 1.) Plaintiffs then filed the operative consolidated complaint in August 2022, asserting claims under Sections 10(b), 14(a) and 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act. (See Compl.) Plaintiffs seek to certify a class consisting of "all persons and entities who purchased Meta Materials' publicly traded securities between September 21, 2020 and June 24, 2022 at approximately 12:59 pm EDT," excluding

Defendants.[7] (Id. ¶ 1.) Defendants moved to dismiss the Complaint in its entirety pursuant to Rules 9(b) and 12(b)(6). (See D.E. # 51.)

## APPLICABLE LEGAL STANDARDS

### I.     Standards for Resolving Motions to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." A complaint will be dismissed unless the plaintiff states a claim that is "plausible on its face" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct . . . ." Id. at 679. "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 430 (2d Cir. 2011). Although courts will not credit "conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," Iqbal, 556 U.S. at 678, the court must accept as true all material factual allegations and draw all reasonable inferences in the plaintiff's favor. Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). First, in Exchange Act cases, the PSLRA requires a complaint to "specify

---

[7] To the extent Plaintiffs seek to represent purchasers of Metamaterial stock on the Canadian Stock Exchange, Plaintiffs' securities claims are barred by Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 268 (2010), superseded by statute on other grounds, Pub. L. No. 111-203, 124 Stat. 1376 (2010). Plaintiffs do not contest Defendants' argument on this point. (See Defs.' Mem. 9 n.7; D.E. # 54 ("Reply") 25 n.29.)

each statement [or omission] alleged to have been misleading, the reason or reasons why the statement [or omission] is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Second, Federal Rule of Civil Procedure 9(b) imposes a comparable requirement on allegations of fraud. See Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "Allegations that do not sound in fraud, however, need only meet the notice pleading standard of Federal Rule of Civil Procedure 8(a)(2)." In re Chembio Diagnostics, Inc. Sec. Litig., 586 F. Supp. 3d 199, 215 (E.D.N.Y. 2022).

## II.    Pleading Standard for Resolving Section 11 and Section 14(a) Claims

As a threshold matter, the parties dispute whether Plaintiffs' claims under Section 11 of the Securities Act and Section 14(a) of the Exchange Act are subject to Rule 9(b)'s heightened pleading standards.[8]  Plaintiffs allege that Meta and two Individual Defendants, Brda and McCabe, violated these two provisions.  (Compl. ¶¶ 257-91, 296-323.)

Section 11 imposes civil liability on issuers and other signatories of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a).  The statute creates a right of action for "any person" who acquired a security offered pursuant to a misleading registration statement.  Id.; In re Initial Pub. Offering Sec. Litig., 241 F. Supp. 2d 281, 344 (S.D.N.Y. 2003).  The Securities Act imposes "a stringent standard of liability," and plaintiffs

---

[8] It is undisputed that the PSLRA's heightened standard applies only to claims brought under the Exchange Act. Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004). Although Plaintiffs' Section 14(a) claim is an Exchange Act claim, the PSLRA's heightened standard does not apply to such a claim if it sounds in negligence. See Fresno Cnty. Emps. Ret. Ass'n v. comScore, Inc., 268 F. Supp. 3d 526, 559 (S.D.N.Y. 2017); accord Dekalb Cnty. Pension Fund v. Transocean Ltd., 817 F.3d 393, 408 & n.90 (2d Cir. 2016).

"need only show a material misstatement or omission to establish [their] prima facie case." Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).

Similarly, Section 14(a) of the Exchange Act bars "the dissemination of proxy statements" in contravention of SEC Rules. Schiller v. Tower Semiconductor, Ltd., 449 F.3d 286, 290 (2d Cir. 2006). SEC Rule 14a-9 "prohibits both the inclusion of 'any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact,' and the omission of 'any material fact necessary in order to make the statements therein not false or misleading.'" Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund v. Transocean Ltd., 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012) (quoting 17 C.F.R. § 240.14a-9(a)).

Both Section 11 and Section 14(a) claims require a plaintiff to plead a material misstatement or omission, but neither claim requires that a defendant act with intent to defraud. See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 401 (S.D.N.Y. 2020) ("[U]nder Section 11[] . . . [plaintiffs] need not allege scienter, reliance, or causation.") (quoting Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016)); Fresno Cnty., 268 F. Supp. 3d at 557 (noting that Section 14(a) does not require a plaintiff to plead "that a defendant acted with intent to defraud"). Defendants may be held liable under these sections for mere negligence. See City of Omaha, 450 F. Supp. 3d at 401 (Section 11); Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir. 1988) (Section 14(a)). Where, however, Section 11 and Section 14(a) claims are grounded in fraud rather than negligence, they must satisfy the heightened pleading standard of Rule 9(b), "even if they disclaim reliance on a fraud theory." In re Columbia Pipeline, Inc., 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019). Plaintiffs may "plead Section 10(b) fraud and Section 11 [and 14(a)] negligence claims as alternatives, as long as the complaint is

organized in a way that allows the court to determine which allegations support which claim." Wallace v. IntraLinks, No. 11-cv-8861 (TPG), 2013 WL 1907685, at *11 (S.D.N.Y. May 8, 2013).

The parties therefore dispute whether Plaintiffs' Section 11 and 14(a) claims sound in negligence or fraud. To make that determination, courts engage in a "case-by-case analysis of particular pleadings to determine whether 'the gravamen of the complaint is plainly fraud.'" In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) (quoting Rombach v. Chang, 355 F.3d 164, 172 (2d Cir. 2004)).

Plaintiffs' Section 11 and 14(a) claims sound in fraud and therefore trigger Rule 9(b)'s heightened standard. Although Plaintiffs separated these claims from their Section 10(b) claims, omit allegations regarding scienter from the negligence claim sections, and disclaim any allegation of fraud as to their Section 11 and 14(a) claims, the Second Circuit has "made clear that this is not a formalistic inquiry." City of Omaha, 450 F. Supp. 3d at 401 (citing Rombach, 355 F.3d at 170). In Rombach, the Second Circuit held that the plaintiffs' Section 11 claims sounded in fraud where "the wording and imputations of the complaint [were] classically associated with fraud" because the Registration Statement was characterized as "inaccurate and misleading," and contained "untrue statements of material facts." Id. at 172 (emphasis omitted). But as other courts have noted, "[t]his passage presents something of a conundrum, because applied literally, it would seem to require applying a 9(b) standard to all claims under § 11." In re Refco, 503 F. Supp. 2d at 631. "Fraud, of course, implies more than falsity, and the mere fact that a statement is misleading (as are all false statements, whether intentionally, negligently or innocently made) does not make it fraudulent." Id. at 631-32. Additionally, Plaintiffs' Section 11 and 14(a) claims identify seven portions of the proxy statement as allegedly false while their Section 10(b) claims are premised on only one portion of the proxy statement. (Compare Compl. ¶¶ 272-88 with ¶¶ 113-15.)

In this case, however, Plaintiffs' overarching theory is that the merger was "secured through fraudulent means." (Opp'n 1); see also In re HEXO Corp. Sec. Litig., 524 F. Supp. 3d 283, 299 n.17 (S.D.N.Y. 2021) (noting that although "plaintiffs separate their claims under the Securities Act and the Exchange Act and disclaim fraud as a basis for their Securities Act claims, their claims rest on the same theory," and thus sound in fraud). In support of this theory, Plaintiffs allege the same "nucleus of operative facts" as the basis for both their Securities Act and Exchange Act claims. See In re Chembio, 586 F. Supp. 3d at 225. Those facts include that: (1) Meta failed to manufacture its metaAIR glasses at scale or sell them in meaningful amounts, (2) its glucoWISE system remained unproven scientifically, (3) it failed to materially develop NanoWeb after acquiring the technology in 2016, and (4) it did not have a production facility capable of producing at commercial levels during the Class Period. (See Compl. ¶ 274 (§ 11 claim); ¶ 109 (§ 10(b) claim); ¶ 302 (§ 14(a) claim).) The same allegations regarding Meta's business relationship with Airbus also purport to support Plaintiffs' Section 11 claims, (id. ¶¶ 280-82), and Sections 10(b) and 14(a) claims, (id. ¶¶ 134-36; 308-09).

Plaintiffs' allegations are thus in contrast to cases where the plaintiffs "demarcate[d] the § 11 claims as in effect a separate complaint," In re Jumei Int'l Holding Ltd. Sec. Litig., No. 14-cv-9826 (WHP), 2017 WL 95176, at *3 (S.D.N.Y. Jan. 10, 2017), or where "the substance of [plaintiffs'] allegations 'ke[]p[t] the distinction [ ] clear,'" In re Refco, 503 F. Supp. 2d at 632. Instead, Plaintiffs "ostensibly separate their Securities Act and Exchange Act pleadings," but the allegations underlying the Section 11 claim are "substantially intertwined" with the Exchange Act claims. See In re Chembio, 586 F. Supp. 3d at 225. This conclusion is supported by the overlap in defendants named in both sets of claims: Meta, Brda, and McCabe. Cf. Fresno, 268 F. Supp.

3d at 558 (noting that § 11 defendants were not named as § 10(b) defendants). Accordingly, I will evaluate Plaintiffs' Section 11 and 14(a) claims under Rule 9(b)'s pleading standard.[9]

## DISCUSSION

The Amended Complaint fails to state a claim for two independent reasons: (1) Plaintiffs fail to plead an actionable misstatement or omission, and (2) Plaintiffs do not plead facts raising a strong inference of scienter.[10] I address each deficiency in turn.

## I.   Alleged Misstatements and Omissions

Because Plaintiffs' securities claims have as an element a material misstatement or omission, I begin with whether Plaintiffs have adequately alleged at least one such statement or omission. See Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38 (2011) (Section 10(b) claim has as an element "a material misrepresentation or omission by the defendant"); Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009) (Section 14(a) claim has as an element "a proxy statement contain[ing] a material misrepresentation or omission"); City of Omaha, 450 F. Supp. 3d at 400 (Section 11 of Securities Act has as an element a material misstatement or omission).

### A. Statements Concerning the Development Status of Meta's Technologies

#### 1. Puffery

Several alleged misstatements constitute non-actionable puffery, and Plaintiffs therefore cannot rely on them to support their securities claims. It is well settled that "expressions of puffery and corporate optimism do not give rise to securities violations." Rombach, 355 F.3d at 174. Non-

---

[9] Because I have determined that Plaintiffs' Section 14(a) claims do not sound in negligence, I will also evaluate those claims under the PSLRA's heightened pleading standard. Cf. Fresno, 268 F. Supp. 3d at 559.

[10] As discussed infra, the scienter analysis I conduct is limited to the alleged omission that presents the closest call: Meta's alleged failure to disclose the lapse of a patent crucial to the commercialization of NanoWeb. (Compl. ¶ 78.)

actionable puffery is "an optimistic statement that is so vague, broad, and non-specific that a reasonable investor would not rely on it." In re Adient plc Sec. Litig., No. 18-cv-9116 (RA), 2020 WL 1644018, at *21 (S.D.N.Y. Apr. 2, 2020) (quoting Galestan v. OneMain Holdings, Inc., 348 F. Supp. 3d 282, 297-98 (S.D.N.Y. 2018)). Puffery is not actionable because corporate officers are "not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994). By contrast, "definite positive projections that might require later correction" may be actionable. See In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (internal citations and quotation marks omitted).

The following statements are mere puffery:

- "META's management, led by George Palikaras has built an extraordinary award-winning cleantech company whose ***proprietary advanced technologies address multiple markets*** and improve their customer's capabilities." (Compl. ¶¶ 91, 102.)

- "META successfully pioneered laser and security eyeglass filtering, to combat powerful pen pointers, for our customers like Airbus."[11] (Id. ¶ 106.)

- "META ***delivers previously unachievable performance***, across a range of applications, by inventing, designing, developing, and manufacturing sustainable, highly functional smart materials. Our technology platform encompasses ***three core capabilities***, holography, lithography, and wireless sensing, and is software and AI-design driven." (Id. ¶ 121, 146.)

- "META has developed a metamaterial technology platform to measure physiological signals with superior accuracy, specificity, and sensitivity." (Id. ¶ 176.)

- "We enable leading global brands to deliver breakthrough products to their customers in consumer electronics, 5G communications, health and wellness, aerospace, automotive, and clean energy." (Id. ¶ 146.)

---

[11] The part of this statement claiming Airbus as a customer is severable and potentially not mere puffery; however, for reasons explained below, the statement is not false because Meta developed the LGP technology in connection with Airbus. See infra.

These statements are "quite general" and "delivered in corporate jargon." Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc., 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019). Adjectives like "superior" and "advanced" are broad statements of optimism. See In re Xinhua Fin. Media, Ltd. Sec. Litig., No. 07-cv-3994 (LTS), 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) (use of "soft adjectives" to describe management team as "strong," "experienced,' and "capable" were "nothing more than puffery"); In re Philip Morris Int'l Inc. Sec. Litig., 437 F. Supp. 3d 329, 350-51 (S.D.N.Y. 2020) (describing studies as "very advanced" was puffery), appeal filed, No. 21-2546 (2d Cir. Oct 8, 2021); City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 173 (3d Cir. 2014) (describing product "as a potential 'breakthrough' drug" was puffery). Statements emphasizing Meta's "three core capabilities" are also puffery because they merely describe the technologies on which Meta is focused or prioritizing. See In re Vale S.A. Sec. Litig., No. 15-cv-9539 (GHW), 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (finding that statements were puffery where they concerned "what Vale is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are"). Because reasonable investors would not rely on these statements, they are non-actionable puffery.

Defendants' statement concerning "proven disruptive technology" presents a closer question, but I ultimately conclude that it constitutes puffery. (See Compl. ¶ 102 ("Metamaterial offers ***proven disruptive technology*** with strong environmental, social and governance (ESG) priorities.").) Considering the context of the statement, which was made in a press release and did not specify to which technologies it was referring, the language is vague enough that no reasonable investor would consider it to be a concrete statement of fact. See In Petrobras Sec. Litig., 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."); see also City of Omaha, 450 F. Supp. 3d at 400 (finding

20

statement concerning defendants' "[e]xperienced management team with proven operational capabilities" to be puffery).

## 2. Bespeaks Caution Doctrine/Forward-Looking Statements

Other challenged statements are forward looking and non-actionable. "Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud." City of Omaha, 450 F. Supp. 3d at 396.

First, the PSLRA creates a statutory "safe harbor" for certain forward-looking statements. 15 U.S.C. §§ 77z–2(b)(2)(D), 78u–5(b)(2)(D). The PSLRA specifically defines "forward-looking statements" as those that contain, among other things, "the plans and objectives of management for future operations," "future economic performance," and "a projection of revenues, income . . . , [or] earnings." 15 U.S.C. § 78u-5(i)(1). Under the PSLRA, defendants are not liable if "(1) the forward-looking statement is identified and accompanied by meaningful cautionary language; (2) the forward-looking statement is immaterial; or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading." In re Vivendi, 838 F.3d at 245 (internal citations and quotation marks omitted). Since this provision is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies. Id. at 245-46.

Second, courts protect forward-looking statements under the bespeaks-caution doctrine, which "is a corollary of the well-established principle that a statement or omission must be considered in context." Iowa Pub. Emps. Ret. Sys. v. MF Glob., Ltd., 620 F.3d 137, 141 (2d Cir. 2010) (internal quotation marks omitted). "A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading. In such circumstances, it cannot be supposed by a reasonable

investor that the future is settled, or unattended by contingency." Id. (citation omitted). However, "cautionary language [that] d[oes] not expressly warn of or d[oes] not directly relate to the risk that brought about plaintiffs' loss" is insufficient. Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 359 (2d Cir. 2002). "The protection of the bespeaks-caution doctrine extends to both claims under the Securities Act and the Exchange Act." City of Omaha, 450 F. Supp. 3d at 397.

Plaintiffs allege that a "Technology Platform Capabilities" slide in an investor presentation and fact sheet misrepresented the development status of Meta's products for three reasons. First, by depicting "a picture of red, green, and blue light" under holography technology, the slide "misrepresented the capabilities of its metaAIR glasses," which allegedly "were designed to protect against green-wavelength lasers only," in contrast to other products in the market, which also blocked light from blue and red wavelengths. (Compl. ¶¶ 149, 156, 171.) Second, the slide lists "glucoWISE non-invasive glucose monitor" and "radiWISE MRI image enhancement" under the wireless sensing technology, which allegedly misrepresents those products as currently in existence and scientifically proven. (Id. ¶ 154.) The slide also appears to depict the glucoWISE product, which purportedly measures glucose concentrations via a device placed in the web of skin between a person's forefinger and thumb. (Id.) Plaintiffs allege that while glucoWISE could potentially detect challenges in glucose concentrations in non-real-world conditions, Meta had not demonstrated the accuracy or efficacy of the product when testing it with blood or through skin (as depicted in the slide). (Id. ¶ 158.) Meta had also "not demonstrated that its radiWISE worked in any pre-clinical or clinical studies." (Id.) Finally, the slide lists NanoWeb and several applications (antennas, reflectors, EMI shielding, de-ice/de-fog) under the lithography section, and Plaintiffs allege that these references misrepresented NanoWeb's development status because

Meta had not materially developed the technology since it was acquired in 2016 and had allowed a patent critical to the production process to lapse. (Id. ¶¶ 154, 157.)

While in isolation, a slide describing Meta's "capabilities" could misleadingly represent products and applications that were currently in existence or that had been developed farther toward commercialization, other slides in the same presentation and Meta's SEC filings make clear that that the products listed included many that were still in development. These products were therefore potential products (i.e., Meta's goals and objectives using their core technologies) protected by the PSLRA's safe harbor and the bespeaks-caution doctrine. Another slide titled "Medical Applications: Mid- to Long-Term (2-7 yrs) Potential," includes radiWise and glucoWISE, and estimates in billions of dollars the products' "market potential." (See Ex. K at 14.) Other applications listed on the challenged slide were explicitly disclosed in Meta's SEC filings as being in development. (See Ex. I at 5 (NanoWeb-enabled products "currently in early stages of development" include "EMI Shielding," "Transparent Antennas," "5G signal enhancement"); id. at 4 ("products in development" include "holographic optical elements" and HUDs listed in slide in holography section).)

Generally, forward-looking statements are "statements whose truth cannot be ascertained until some time after they are made." In re Vale, 2017 WL 1102666, at *24 (quoting In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011)). Here, the total mix of information available to investors reflected that the products and applications listed on the slide were in development, which means that at the time the slide was published, it would not be ascertainable whether the potential products would ultimately be effective and scalable.[12] To the extent the slide implied that the products were on pace for future

---

[12] The issue of the wavelengths blocked by the metaAIR product presents a somewhat closer question because Plaintiffs allege that the metaAIR glasses "were designed to protect against green-wavelength lasers only." (Compl.

commercialization, even an explicit statement to that effect would not be actionable. See Institutional Invs. Grp. v. Avaya, Inc., 564 F.3d 242, 255-56 (3d Cir. 2009) (holding that a company's statement that it was "on track" to meet a future projection did "not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor")); In re Adient, 2020 WL 1644018, at *19 (finding that statements about being "on track" with respect to projected margin expansion were "forward-looking" statements within the meaning of the PSLRA and not statements of "present fact").

The "Technology Platform Capabilities" slide was also accompanied by meaningful cautionary language. The presentation includes a forward-looking statements disclaimer and lists the following factors that could lead to a materially adverse result: "the market potential of the products," "the scalability of the Company's production ability," and "the ability to accelerate commercialization plans." (Ex. K at 2.) The presentation incorporated by reference the "Risk Factors" in Meta's 2021 10-K, which included the warning that "there can be no assurances" that Meta's products will be commercially viable (or exist at all). (Ex. I at 11 (emphasis added).) These statements are sufficiently specific and meaningful, and Defendants are "not obligated to predict correctly 'the particular factor that ultimately causes [their] projection not to come true.'" In re WEBMD Health Corp. Sec. Litig., No. 11-cv-5382 (JFK), 2013 WL 64511, at *9-10 (S.D.N.Y. Jan. 2, 2013) (quoting Slayton v. Am. Express Co., 604 F.3d 758, 770 (2d Cir. 2010)) (alteration in original). Accordingly, the slide is not an actionable misstatement.

---

¶ 156 (emphasis added).) Considered alone, for what purpose the glasses were designed is a presently ascertainable fact that might be misrepresented by the depiction of three wavelengths of light. (See id. ¶ 154.) But for one thing, it is not clear that the three wavelengths depicted are meant to apply to the metaAIR product, as opposed to one of the other listed applications. (See id.) And because the context of the slide makes clear that a reasonable investor should not rely on the listed products and applications as reflecting the products that will ultimately be scaled or commercialized, the entire slide is protected as forward looking.

### 3. Falsity

The pleading standard for falsity is the same under both the Securities Act and the Exchange Act. See Abramson v. Newlink Genetics Corp., 965 F.3d 165, 175 (2d Cir. 2020). To survive a motion to dismiss, a complaint must adequately plead "that the defendant made a statement that was 'misleading as to a material fact.'" Matrixx Initiatives, 563 U.S. at 38 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)) (emphasis omitted). "[U]ntrue assertions, ambiguous statements, and half-truths can render a statement misleading." SEC v. StratoComm Corp., 652 F. App'x 35, 37 (2d Cir. 2016) (summary order) (citing SEC v. N. Am. Res. & Dev. Corp., 424 F.2d 63, 75-77 (2d Cir. 1970)). The question is whether "the statements, taken together, created a misleading and false impression." Id. at 37. Omitting information not affirmatively required to be disclosed is actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" Matrixx Initiatives, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b–5(b)); In re Vivendi, 838 F.3d at 239-40 ("Pure omissions" of information, absent a duty to disclose, are not actionable, but "half-truths—statements that are misleading . . . by virtue of what they omit to disclose," are actionable (internal quotation marks omitted)).

The materiality requirement "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" Matrixx Initiatives, 563 U.S. at 38 (quoting Basic, 485 U.S. at 231-32). Because the materiality inquiry is fact-intensive, I may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not

differ on the question of their importance." ECA & Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (citation omitted).

Plaintiffs first assert that several statements are actionable because Defendants represented publicly that Meta "actively had commercial products in various markets and industries" when in fact, the company "did not have any products designed, proven, or otherwise ready for commercialization in any market or industry." (Opp'n 25-26 (citing Compl. ¶¶ 92-93, 103-04, 107, 110-11, 122-26).) Those statements include:

- In the September 21, 2020 press release announcing the merger, Defendants stated: "The combined entity [Meta] *will continue to service* a clientele of world-class [original equipment manufacturer] customers for a range of applications in the automotive, aerospace and defense, energy, consumer electronics and medical markets." (Compl. ¶ 91.)

- In a December 14, 2020 press release, Defendants stated that the merger transaction "provides our shareholders with *access to the multibillion-dollar markets that Metamaterial serves* and new applications that are being revolutionized with their sustainable technologies . . . ." (Id. ¶ 102.)

- In the Proxy, Defendants stated: "*Meta has many product concepts currently in different stages of development with multiple customers in diverse market verticals*. Meta's business model is to co-develop innovative products or applications with industry leaders that add value. *This approach enables Meta to understand market dynamics and ensure the relevance and need for Meta's products*." (Id. ¶ 277.)

- "Meta has generated a portfolio of intellectual property and is *now moving toward commercializing products* at a performance and price point combination that has the potential to be disruptive in multiple market verticals. . . . Meta's advanced structural design technologies and *scalable manufacturing methods* provide a path to broad commercial opportunities in aerospace, medical, automotive, energy and other industries." (Id. ¶ 109.)[13]

Plaintiffs argue that the use of present-tense verbs to describe customers and markets that Meta "serves" or "will continue to service," indicated to investors that Meta had commercial products serving client needs in multiple industries. (Opp'n 26.) Similarly, Meta's assertions that

---

[13] As noted earlier, these alleged misstatements appeared in several documents. (See, e.g., Compl. ¶¶ 113, 117, 142, 161.)

it was "now moving toward commercializing products" and had "scalable manufacturing methods" implied that it had completed product designs and all that remained was to commercialize and/or scale those products. (See id.) Those impression were false, according to Plaintiffs, because Meta (1) failed to manufacture its metaAIR glasses at scale or sell them in meaningful amounts, (2) its glucoWISE system remained unproven scientifically, (3) it failed to materially develop NanoWeb after acquiring the technology in 2016 and ceased paying for a patent necessary to the production process, and (4) it did not have a production facility capable of producing its products at commercial levels during the Class Period. (See Compl. ¶¶ 109, 274, 302.) At the time the statements were made, Meta's only contractual customer was Satair (one customer in one industry, aviation). (Id. ¶ 104.)

The above statements are either not false, not misleading, or are not material as a matter of law given Defendants' thorough disclosures in their SEC filings. It is axiomatic that a securities fraud claim does not lie when the company "disclosed the very . . . risks about which [plaintiffs] claim to have been misled." Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 338 (2d Cir. 2011) (affirming dismissal of § 10(b) claims). The issue can be described in terms of materiality because additional disclosures would not alter the "total mix" of information available to a reasonable investor. See Halperin v. eBanker USA.com, Inc., 295 F.3d 352, 357 (2d Cir. 2002). Importantly, "[o]nce a company discloses material objective factual matters, it need not characterize or editorialize on those facts in any particular way." In re MGT Cap. Invs., Inc. Sec. Litig., No. 16-cv-7415 (NRB), 2018 WL 1224945, at *11 (S.D.N.Y. Feb. 27, 2018) (internal quotation marks and citation omitted).

Defendants repeatedly disclosed the material objective fact that, other than the metaAIR LGP eyewear product, the company's products were in the development stage (i.e., not

commercially ready), and Meta's facilities were incapable of producing at commercial volume. For example, the Proxy stated that "Meta has many product concepts currently in different stages of development." (Ex. B at 58.) Meta also disclosed that "there can be no assurances that [its] research and market development activities will prove profitable or that the resulting markets and/or products, if any, will be commercially viable or successfully produced and marketed," which "may materially affect the Combined Company's business." (Id. at 53.) As to metaAIR specifically, Defendants disclosed that the company had commercially launched metaAIR LGP eyewear in 2020 and, at the time of the merger, was working on "additional products in development" using that technology in the automobile and aircraft industries. (Id. at 58.) With respect to NanoWeb, Meta disclosed that it had developed a "prototype product" in lithography, NanoWeb, a transparent conductive film. (Id. at 59.) The Proxy noted that Meta has "six NanoWeb-enabled products and applications that are currently in early stages of development," including NanoWeb for "Transparent EMI Shielding," "5G signal enhancement," "Transparent Antennas," "Touch Screen Sensors," "Solar cells" and "Transparent Heating to de-ice and de-fog." (Id.)

A reasonable investor would not necessarily consider broad language about the markets Meta "serves" as indicating that the company had commercialized products in each of those markets. Plaintiffs do not appear to contest that Meta had one product, metaAIR LGP eyewear. (See Opp'n 13.) Nor is it clearly false that Meta can service customers in multiple industries even without commercialized products. In the Proxy, Meta states that its lithography-related products "are in the design and prototyping phase and Meta is performing market trials with potential customers," which indicates at a minimum Meta's belief that it was in the "potential" customer stage with respect to at least one major segment. (Id.) The Proxy further states that "[t]he

28

lithography-related products have not yet reached the required technical maturity and are expected to be launched in two to three years' time after a successful product development completion." (Id. at 52.) Confirming that Meta was not presently scaling or producing its products at commercial levels, the Proxy states: "[Meta] plans to scale its lithography production in Canada and plans to move into a larger facility suitable to host the holography and lithography production scale up as the current facility does not have enough space and capability to have production line for lithography." (Id. at 53.) Such "plans to scale" were "dependent on obtaining adequate additional funding." (Id.) Although Meta's disclosures clarified that it could produce "samples of NanoWeb, at a small volumes scale, for industry customers/partners," (id. at 59), "producing at larger scale and volumes would require additional growth capital and there [could] be no assurance that additional financing would be available," (id. at 50-51). Thus, Meta had industry "customers" for which it could produce samples of its products, further illustrating that it was not false or misleading for Meta to state that it serviced customers in multiple markets. (See id. at 60 (Meta delivered "NanoWeb samples for testing in solar and energy product applications").) As to the wireless sensing segment, Meta disclosed that its "wireless sensing technology to enhance MRI imaging and non-invasive glucose monitoring [was] under development" in its London office. (Id. at 54.) The product concepts utilizing wireless sensing technology include glucoWISE and RadiWISE. (Id. at 59 (Meta "is developing" RadiWISE, another "innovation"); Ex. I at 6; Ex. J at 8 (glucoWISE™ "is in development").)

As a result of these disclosures, no reasonable investor would have assumed that "now moving toward commercializing products" meant that Meta had completed product development entirely and was now, in fact, commercializing products. Plaintiffs emphasize certain facts they argue show that Meta was not approaching commercialization, such as the failure to manufacture

the metaAIR glasses at scale, the fact that glucoWISE was unproven scientifically, and that Meta

had ceased paying for a patent necessary to the NanoWeb production process. (See Compl. ¶¶ 109,

274, 302.) But because Meta disclosed that its products were in the development and prototyping

phase, a reasonable investor would not have been misled about whether Meta was beginning the

scaling and commercialization process. See Halperin, 295 F.3d at 361 ("The allegedly omitted

facts were either disclosed or implied in the offering memoranda"). Even if investors would have

been interested in these facts, which could affect their view of how long it might take Meta to

commercialize certain products, the Second Circuit has held that "a corporation is not required to

disclose a fact merely because a reasonable investor would very much like to know that fact."

Dalberth v. Xerox, Inc., 766 F.3d 172, 183 (2d Cir. 2014) (citation omitted); see Born v.

Quad/Graphics, Inc., 521 F. Supp. 3d 469, 487 (S.D.N.Y. 2021) ("[T]he requirement to be

complete and accurate . . . does not mean that by revealing one fact . . . one must reveal all others

that, too, would be interesting . . . but means only such others, if any, that are needed so that what

was revealed would not be so incomplete as to mislead." (quoting In re Bristol Myers Squibb Co.

Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)). Accordingly, "[w]hile Plaintiffs may have

desired more detailed or nuanced language, that is not what the law requires." Dalberth, 766 F.3d

at 186.

    The cases upon which Plaintiffs rely are inapposite. In In re QuantumScape Securities

Class Action Litigation, 580 F. Supp. 3d 714 (N.D. Cal. 2022), the defendants allegedly "misled

investors about the progress and effectiveness of their 'solid-state batteries,'" which are "an

aspiring competitor to conventional lithium-ion batteries." Id. at 722. The batteries "ha[d] never

been successfully commercialized due, in part, to a well-known set of challenges," and defendants

"repeatedly represented that their batteries had overcome those challenges and were comparable

to or outperformed the conventional batteries on the market." Id. The court found that defendants'
statement about their batteries being "in fact ready for commercial deployment as soon as we can
scale up production and make multilayer versions of these cells" was not puffery or an opinion
statement because the statement was a "concrete statement about the batteries' stage in
development." Id. at 740. The court rejected defendants' arguments that their disclosures were
sufficient because "it was misleading to suggest that the only major steps in battery development
that remain[ed] were" to scale up production when numerous foundational issues concerning the
batteries remained. Id. at 734-35. By contrast, Defendants here made no representation that their
products were "in fact ready for commercial deployment" with the specific caveat of one remaining
task: scaling. Instead, Meta consistently disclosed that its product concepts were at various stages
of development and that there could be no assurances that products would result from its core
technologies at all. (See, e.g., Ex. B at 53, 58.)

Plaintiffs also cite SEC v. StratoComm Corp. for the proposition that "Defendants'
statements about the commercial-readiness of Metamaterial's products and its supposed then-
existing role in various markets and industries were materially misleading." (Opp'n 27.) But
there, the Second Circuit emphasized that the defendant company's press release "touted
'contracts' for the 'sale' of 'Transitional Telecommunications System' ('TTS') units, leaving the
clear impression that . . . there was a product that was available to be sold." 652 F. App'x at 37.
Although the defendant possessed the proprietary technology to build a TTS system, it was
undisputed that it (1) never actually built a TTS, (2) never tested an operational prototype, and
(3) never had funds or parts to construct a TTS. Id. at 37-38. Thus, the court determined that
advertising contracts for the sale of a system that did not exist, even at the prototype level, was
misleading. Id. ("[T]here is no question that an investor would care whether a product is one that

exists in the world."). Here, however, Meta "touted" the sale of only two products: the metaAIR LGP glasses and, arguably, "samples" of NanoWeb. (Ex. B at 59, 60 (during 2020, Meta demonstrated a "prototype" of NanoWeb films for de-fogging, resulting in approval for delivery of 40 samples); see id. (Meta delivered "NanoWeb samples for testing in solar and energy product applications").) Plaintiffs do not contend that Meta did not make those sales.[14] As to the rest of its product concepts, Meta's disclosures made clear that it was in the design and prototyping phase, and Plaintiffs do not plead facts suggesting that Meta did not have the product designs or prototypes of which it spoke.[15] (See, e.g., Ex. B at 59.)

Plaintiffs' assertion that Meta "did not even have a production facility capable of producing" at "commercial levels," (e.g., Compl. ¶¶ 61, 115), also does not render false the "moving toward commercializing" statement. Plaintiffs cite the opinion of a confidential witness, FE1, a "Production Technician" at the Halifax, Nova Scotia facility. (Id. ¶ 61.) As an initial matter, Plaintiffs plead insufficient facts to establish that FE1's opinion should be extrapolated outside of the Canadian facility. See Novak v. Kasaks, 216 F.3d 300, 314 (2d Cir. 2000) (confidential sources must be described "with sufficient particularity to support the probability that

---

[14] Plaintiffs do cite the following from the Proxy as an alleged misstatement: "Meta sold 50 units during 2019 and it is further increasing its reach to airlines through Airbus and Satair." (Compl. ¶ 287.) However, contrary to their Rule 9(b) obligations, Plaintiffs plead no specific facts suggesting that Meta did not sell 50 units of metaAIR during 2019 or that the company could not be said to be increasing its reach in the aviation sector through Airbus and Satair. See Rombach, 355 F.3d at 174 (plaintiff must show "why and how" a statement is false). In any event, Plaintiffs have abandoned any claim based on this misstatement. (Compare Defs.' Mem. 15-16 with Opp'n); see Gorfinkel v. Vayntrub, No. 11-cv-3093 (PKC), 2014 WL 4175914, at *4 (E.D.N.Y. Aug. 20, 2014) (dismissing claims against two defendants because the plaintiff "waived any opposition with respect to [defendants'] argument [for dismissal] by failing to oppose . . . motion [to dismiss] on that basis").

[15] Defendants' statements that Meta was "now moving toward commercializing products" could also be characterized as opinion statements. Statements of opinion "include subjective statements that reflect judgments as to values that [are] not objectively determinable." In re Gen. Elec. Co. Sec. Litig., 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012) (citation omitted). Opinion statements are not actionable "so long as the speaker actually held the belief professed, did not supply an untrue supporting fact, and did not omit information rendering the statement misleading." In re Aratana Therapeutics Inc. Sec. Litig., 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018). Plaintiffs here "do[] not adequately show that any Defendant falsely or unreasonably held the opinions they publicly discussed." In re Adient, 2020 WL 1644018, at *16. Rather, Defendants point to facts in Meta's SEC filings suggesting the company had made progress towards commercialization in their various segments. (See Ex. B at 58-60, 63, 67, N-50-51, N-54-55; Ex. L at 24; Ex. J at 43-44.)

a person in the position occupied by the source would possess the information alleged"). In any event, the market was already aware that Meta's Canadian facility currently "does not have enough space and capability to have [a] production line" for lithography, (Ex. B at 53), and was producing "samples" "at a small volumes scale," (Compl. ¶ 283).

Defendants' alleged misstatements concerning specific technologies or products fare no better. For example, Defendants allegedly made the following statements about their wireless sensing segment:

- In the context of a July 6, 2021 press release titled "META Completes UK-Funded Project towards Developing Non-Invasive Glucose Sensing System," Defendants stated: "During previous published human studies, wearable metamaterial films have been demonstrated to help boost these signals by up to 240%, significantly enhancing the accuracy of the system. The team aims to continue the development and is in discussions with strategic partners who can accelerate the commercialization." (Compl. ¶ 128.)

- In the Proxy, Defendants stated: "This breakthrough wireless sensing technology is made using proprietary patterned designs, printed on metal-dielectric structures on flexible substrates that act as anti-reflection (impedance-matching) coatings when placed over the human skin in combination with medical diagnostic modalities, such as MRI, ultrasound systems, non-invasive glucometers etc." (Id. ¶ 285.)

- In a May 25, 2022 press release titled "Dr. Panos Kosmas to Deliver Keynote Lecture on New Medical Technology for Stroke Detection," Defendants stated: "*META has developed a metamaterial technology platform to measure physiological signals with superior accuracy, specificity, and sensitivity*. META's technology leverages metamaterials to bend light in non-ordinary ways. When a metamaterial film is placed on the skin, the signal can penetrate the tissue, improving sensing accuracy."[16] (Id. ¶¶ 175-76.)

- In the same press release, Defendants stated: "*META has demonstrated and published the effectiveness of metamaterial technology in both imaging and sensing applications*. I am personally excited about how this technology will make a difference in people's lives." (Id.)

These alleged misstatements are either not false or are immaterial as a matter of law given Defendants' disclosures. Plaintiffs argue that these statements were misleading because they

---

[16] I earlier found that this statement constitutes non-actionable puffery, see supra, but as analyzed below, the statement is non-actionable for the independent reason that it is either not false or immaterial as a matter of law.

"painted a picture of a product that was much further along the path towards commercialization than it truly was." (Opp'n 29.) Specifically, Plaintiffs allege that glucoWISE was currently untested in real-world conditions and that there were no "published human studies" as mentioned in the July 6, 2021 press release. (Compl. ¶¶ 129, 158.) In fact, Meta allegedly "had not performed any testing capable of demonstrat[ing] the effectiveness of its technology." (Id. ¶ 129.)

But whether Defendants disclosed that glucoWISE was "under development" or that its technology was "not scientifically proven," the bottom line was the same: Meta would require additional work and funding to produce a scalable product using the non-invasive glucose monitor technology. Meta disclosed the material fact that its glucoWISE system was "under development," (see Ex. B. at 54, 59; Ex. J at 8), and emphasized that "there can be no assurances" that its "development activities will prove profitable or that the resulting markets and/or products, if any, will be commercially viable or successfully produced and marketed. (Ex. B at 53.)

Moreover, the press release contains cautionary language and additional details that provide context to the statements Plaintiffs allege are false or misleading. The press release describes "the conclusion of a 27-month long project to develop a non-invasive glucose sensing prototype." (Ex. E (July 6, 2021 press release) at 1.) Meta explains that the prototype "is a critical step towards a 'Home Hub' system targeted at monitoring biological parameters." (Id.) Plaintiffs highlight Defendants' use of present-tense verbs to describe the prototype ("[The system] uses multiwavelength biosensing technology . . . ."), but in context, Defendants are describing a "product concept" and how the prototypes that were developed were designed to work. (See id.) The press release warned with specificity that additional challenges to developing a non-invasive glucose monitor lay ahead: "Accurately measuring glucose without drawing blood must overcome a number of challenges, including the weak signature of the glucose molecule," "signal

interference from other biological substances," and "ambient temperature and skin moisture" factors. (Id.) Plaintiffs also pull out the sentences concerning "previous published human studies," which may have been false or misleading in isolation, but the release also stated that its results were obtained "in a laboratory environment" and that "pre-clinical human studies" were "scheduled to start this summer." (Id. at 1-2); see Solmetex, LLC v. Dental Recycling of N. Am., Inc., No. 17-cv-860 (JSR), 2017 WL 2840282, at *4 (S.D.N.Y. June 26, 2017) ("[A party] cannot plead falsity by quoting statements out of context."). In addition, courts presume that a reasonable investor would review a press release alongside securities filings, and here Meta's filings disclosed that glucoWISE was under development. See In re Curaleaf Holdings, Inc. Sec. Litig., 519 F. Supp. 3d 99, 108 (E.D.N.Y. 2021) ("[N]ot every public statement made by the Company need contain the full roster of disclosures detailed in the Company's securities filings."); see also In re Cross Media Mktg. Corp. Sec. Litig., 314 F. Supp. 2d 256, 268 (S.D.N.Y. 2004) (reasonable investor would have reviewed securities filings and not been misled by press release containing cautions).

SEC v. Platforms Wireless International Corp., to which Plaintiffs cite, does not counsel otherwise. There, the Ninth Circuit held that the challenged press release "was materially misleading because it only permits the conclusion that [the defendant] was announcing it had actually developed a viable ARC system." 617 F.3d 1072, 1094 (9th Cir. 2010). The press release described technical details and performance characteristics—including the speed at which the system resists winds up to—of five models of a system that did not exist. Id. at 1094-95. Here, by contrast, the press release does not permit the conclusion that a functioning, non-invasive glucose monitor currently existed.

Plaintiffs also challenge a statement pertaining to the lithography segment and NanoWeb technology:

- In the Proxy, Defendants stated: "Meta's current principal prototype product in lithography technology is its transparent conductive film, NanoWeb®. The lithography division operates out of Meta's wholly owned U.S. subsidiary, which can produce meter-long samples of NanoWeb®, at a small volumes scale, for industry customers/partners.

  There are six NanoWeb®-enabled products and applications that are currently in early stages of development including NanoWeb® for Transparent EMI Shielding, NanoWeb® for 5G signal enhancement, NanoWeb Transparent Antennas, NanoWeb® for Touch Screen Sensors, NanoWeb® for Solar cells and NanoWeb® for Transparent Heating to de-ice and de-fog. Currently these products are in the design and prototyping phase and Meta is performing market trials with potential customers." (Compl. ¶ 283.)

Plaintiffs argue this statement is false or misleading as to the development and commercialization status of NanoWeb. (Id. ¶ 284.) Plaintiffs allege that in mid-2016, Meta acquired the NanoWeb technology from a company called Rolith, and that although numerous competitive technologies have since entered the market, Meta's development of NanoWeb has been stagnant. (Id.) Not only has Meta failed to further develop NanoWeb, according to Plaintiffs, but Meta terminated its license for a "critical patent" required by "the NanoWeb production process." (Id.) Plaintiffs argue that failing to disclose to investors that Meta had stopped paying for the license was a material omission.

The above Proxy statement is not false or misleading. The statement notes that Meta currently can produce samples of NanoWeb, "at a small volumes scale," and that NanoWeb-enabled products and applications "are currently in early stages of development." (Id. ¶ 283.) Therefore, even in the alleged misstatement itself, Meta sufficiently disclosed the development status of NanoWeb, and other disclosures in Meta's SEC filings demonstrate the same. (See, e.g., Ex. B at 59 ("Currently these [NanoWeb-enabled] products are in the design and prototyping phase and Meta is performing market trials with potential customers.").) Meta also adequately disclosed

the fact that its facilities were currently incapable of producing at commercial scale. (See id. at 53 ("[Meta] plans to move into a larger facility suitable to host the holography and lithography production scale up as the current facility does not have enough space and capability to have production line for lithography.").)

The alleged omission concerning the NanoWeb patent is the closest Plaintiffs come to pleading a misleading omission. Defendants assert that they never made representations concerning licensing, but "[t]he touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information" available to investors. See Halperin, 295 F.3d at 357. Plaintiffs allege that a patent upon which Meta had "historically relied" to develop NanoWeb, and which was "critical to NanoWeb's production," had lapsed. (Compl. ¶¶ 78, 188.) In other words, Plaintiffs allege that without the patent, Defendants would not be capable of producing NanoWeb and therefore it is false or misleading for Defendants' statements to imply that Meta could be "moving towards commercializing" NanoWeb or that it could be "Meta's current principal prototype product in lithography." See Meyer v. JinkoSolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014) ("Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.").

However, as described above, Meta's disclosures also made clear that Meta could not yet begin producing NanoWeb at commercial scale, and Plaintiffs have not pleaded that Meta needed the patent to engage in the development activities it had been undertaking, or that Meta could not obtain a license if and when it was ready to commercialize the product. (See Ex. B at 59 (lithography products in "the design and prototyping phase); Compl. ¶ 283 (NanoWeb-enabled products and application in the "early stages of development").) Plaintiffs do not allege that Meta

37

was unable to produce prototypes or samples of NanoWeb; only that it was false for Meta to assert that it was "moving toward commercializing" the product. (See Oral Arg. Tr. 5:23-6:6 (Defendants' counsel clarifying that Meta did not need a license "to develop the product" but only for commercialization).) Meta adequately warned that it could be years before NanoWeb products could be launched. (Ex. B at 52 ("The lithography-related products have not yet reached the required technical maturity and are expected to be launched in two to three years' time after a successful product development completion").) Meta also sufficiently warned investors that there could be no guarantee that its product development activities would "prove profitable" or that the product concepts would be produced at all. (See id. at 53 ("there can be no assurances that . . . the resulting markets and/or products, if any, will be commercially viable or successfully produced and marketed," which "may materially affect the Combined Company's business.").) Because Meta disclosed the risk that it may not successfully develop or market NanoWeb-enabled products or applications, the alleged omission regarding the NanoWeb patent lapse is not actionable.

Defendants also made the following alleged misstatement in the Proxy:

- "On March 28, 2013, Meta incorporated Lamda Guard Inc., Lamda Lux Inc., and Lamda Solar Inc., under the federal laws of Canada, as wholly-owned subsidiaries of Meta. *These subsidiaries have minimal operational activity.*" (Compl. ¶ 275.)

- METAAIR® is a holographic optical filter developed using nano-patterned designs that block and deflect *specific colors or wavelengths of light.*" (Id. ¶ 134.)

Plaintiffs allege that the statement involving the subsidiaries was false because the segments had no operational activity. (Id. ¶¶ 275-76.) Before Meta's lithography and wireless sensing segments came into existence in 2016 and 2018, respectively, these three segments represented Metamaterial's core operations. (Id. ¶¶ 57, 59.) Thus, according to Plaintiffs, the difference between "minimal" and "no" is material because it did not reveal that Meta was entirely reliant on its other segments at the time of the merger. (Id. ¶ 276.) I conclude that the alleged

misstatement is not materially false or misleading because both "minimal" and "no" activity adequately convey a lack of operational activity. Defendants' filings and other published statements consistently focused on its currently operational holography, lithography, and wireless sensing segments and Plaintiffs plead no facts suggesting that the disclosure of "no" instead of "minimal" activity "would have 'significantly altered the total mix of information available' to investors." Tongue, 816 F.3d at 208 & n.11; see In re Curaleaf, 519 F. Supp. 3d at 107 ("There is no requirement that a Company disclose its risk in any magic words preferred by plaintiffs."); City of Austin Police Ret. Sys. v. Kinross Gold Corp., 957 F. Supp. 2d 277, 298 (S.D.N.Y. 2013) (distinction between "relatively hard" and "very hard" ore not meaningful); In re Merrill Lynch Auction Rate Sec. Litig., 704 F. Supp. 2d 378, 392 (S.D.N.Y. 2010), aff'd sub nom. Wilson v. Merrill Lynch & Co., 671 F.3d 120 (2d Cir. 2011) ("semantic distinction [between 'routinely' and 'systematically'] is not persuasive").

The statement concerning metaAIR's ability to deflect certain colors or wavelengths of light was allegedly false or misleading because the technology was designed to block green wavelengths only. (Compl. ¶¶ 280, 282.) Plaintiffs argue that this limitation was significant because other products in the market offered protection against all colors (i.e., green, red, and blue wavelengths) and were being sold at a fraction of metaAIR's cost. (Id. ¶ 279.) I conclude that the statement is immaterial and/or sufficiently covered by Defendants' disclosures. Meta consistently warned that "[t]here is uncertainty surrounding whether the aviation industry may accept holography laser protection related products such as metaAIR" and "there can be no assurance that the aviation market will accept the metaAIR product at the expected market penetration rates." (Ex. B at 52.) As alleged, the materiality of the alleged misstatement, "colors," hinges on the extent to which metaAIR would be disadvantaged in the market as compared to other products that

blocked additional colors. Because Meta adequately disclosed the risk that metaAIR would not be accepted by the market, Defendants were under no further obligation to disclose the specific colors the product did or did not block. See Dalberth, 766 F.3d at 186. Accordingly, Plaintiffs have not pleaded an actionable misstatement or omission with respect to the development and commercial readiness of Meta's products.[17]

### B. Statements Concerning Meta's Business Relationships

Plaintiffs next challenge Defendants' statements concerning Meta's relationship with Lockheed Martin and Airbus. These alleged misstatements are either not false or misleading or are immaterial as a matter of law given Defendants' disclosures.

- September 21, 2020 press release announcing the merger: "In 2018 META was awarded "Best New Product in Commercial Aviation" by Aviation Week Network at the 63rd Annual Laureate Awards, for metaAIR®, a Laser Strike Protection solution to protect pilots from harmful laser attacks without interfering with visibility. ***META partnered with Airbus to develop and commercialize this technology***." (Compl. ¶ 91.)

- November 30, 2020 shareholder letter: Defendants listed Lockheed Martin and Airbus in a list of Meta's "corporate partners, some of whom have also invested in META." (Id. ¶ 97.)

- "***META has also partnered with Lockheed Martin*** and the Canadian Government's Sustainable Development Technology Canada (SDTC) fund to develop metaSOLAR™ a new solar energy product suitable for the transportation industry." (Id.)

- The Proxy: "Meta co-developed its metaAIR laser protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using Meta's holography technology. (Id. ¶ 280.)

---

[17] Defendants also raise a truth-on-the-market defense as a basis for dismissal. See In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 287 (S.D.N.Y. 2006) ("The 'truth-on-the-market' defense can apply to statements of present or historical fact and renders any misstatements or omissions immaterial as a matter of law."). I recognize that since this is a fact-bound determination, the truth-on-the-market defense is generally not a suitable ground for dismissal and I therefore do not rely on it. See Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 (2d Cir. 2000). It is worth noting, however, that Defendants' historical challenges concerning product development were already known to the market prior to the merger. Plaintiffs allege that from day one of the Class Period, the market "was skeptical of the [merger] transaction due to the fact that Metamaterial had not been successful in bringing any products to market and had, in fact, cultivated a long list of product and development failures." (Compl. ¶¶ 49, 50, 63, 217; see also id. ¶ 75 ("[F]or investors who were already skeptical of Meta Materials and the merger, the Kerrisdale report simply reaffirmed how Meta Materials 'habitually made outlandish and misleading claims about the feasibility, development, and commercial potential of various technologies[.]'").)

- August 13, 2021 Quarterly Report, Form 10-Q: "Meta co-developed its METAAIR® laser protection eyewear product with Airbus S.A.S. that has been engineered to provide laser glare protection for pilots, military and law enforcement using Meta's holography technology. (Id. ¶ 134.)

- "***The Company has co-developed this product with Airbus through a strategic partnership***. Airbus further extended its support by introducing the Company to Satair, an Airbus owned company, which became the global distribution partner for METAAIR® to the aviation market. ***Since 2016, Airbus and Satair invested a total of $2,000,000 for the product development and exclusive distribution rights***." (Id.)

Plaintiffs argue that Meta misrepresented its relationship with these well-known companies to induce investors to believe that Meta's "business dealings were far more substantial than they truly were." (Opp'n 30.) Plaintiffs assert that Meta misrepresented its relationship with Lockheed Martin as a "partnership" when the contract between Metamaterial and Lockheed Martin explicitly disclaimed a legal partnership. (Compl. ¶ 94.) The reference to "partnership," however, refers to a partner in the colloquial sense. For example, Meta stated that it has "partnered with Lockheed Martin," (id. ¶ 91), and Lockheed Martin is a "corporate partner[]," (id. ¶ 97). See Billhofer v. Flamel Techs., S.A., No. 07-cv-9920 (RWS), 2012 WL 3079186, at *7-8 (S.D.N.Y. 2012) (statements referring to GSK as a "partner" did not misleadingly describe the relationship; "[t]he term 'partnership' is simply too broad and vague"). Meta did partner with Lockheed Martin in at least the non-legal sense when it signed a contract in 2017 to make a multi-million-dollar investment in Meta for the research, development, and commercialization of MetaSOLAR technology. (Compl. ¶¶ 36, 48, 91, 99; Ex. B at 67.) Because Defendants described the nature of the Lockheed Martin relationship in its disclosures, no reasonable investor could be misled as to the scope of the relationship. See Billhofer, 2012 WL 3079186, at *7 (inference of a legal partnership "less reasonable given the Defendants' disclosures, which described the limited scope of the . . . 'partnership'").

Plaintiffs also challenge the statements suggesting that Meta partnered with Airbus to commercialize metaAir because "the actual distribution agreement was made with Satair, an Airbus subsidiary." (Compl. ¶¶ 94, 281; see id. ¶¶ 107, 280, 288.) However, Meta's SEC filings consistently disclosed that the distribution agreement was with "Satair, an Airbus owned company." (Ex. B at 52, 58, 67-68.) Plaintiffs further challenge the statement that Meta "co-developed its metaAir laser protection eyewear product with Airbus" because Meta's relationship with Airbus pertained to "aircraft windshields," a product Meta had "abandoned," not its later eyewear product. (Opp'n 13, 30; Compl. ¶¶ 100, 281, 288.) This statement is neither false nor misleading because the total mix of information indicates that the LGP technology underlying the metaAIR eyewear product is the same technology Airbus agreed to co-develop. (Compl. ¶¶ 53-54, 281.) Even if Meta did not explicitly disclose its pivot from applying the LGP technology to windshields to applying it to eyewear, companies are generally not required to disclose shifts in business strategy. See In re Farfetch Ltd. Sec. Litig., No. 19-cv-8657 (AJN), 2021 WL 4461264, at *12 (S.D.N.Y. Sept. 29, 2021), aff'd sub nom., IAM Nat'l Pension Fund v. Farfetch Ltd., No. 21-2752, 2023 WL 2879304 (2d Cir. Apr. 11, 2023); see also Friedman v. Endo Int'l PLC, No. 16-cv-3912 (JMF), 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018) ("It is . . . well established that a company has no such duty to disclose changes to its business plans," unless the plaintiff plausibly alleges that "a company had stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors" (cleaned up)). Accordingly, the alleged misstatements concerning Meta's business relationships are not actionable.

* * *

For the foregoing reasons, Plaintiffs have failed to plead an actionable misstatement or omission. As a result, Plaintiffs cannot state causes of action under Sections 10(b) and 14(a) of

the Exchange Act and Section 11 of the Securities Act. Because Plaintiffs did not state underlying violations of the securities laws, their control person liability claims under Section 20(a) of the Exchange Act and Section 15 of the Securities Act also fail. See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig., No. 03-cv-8208 (RO), 2006 WL 1008138, at *11 (S.D.N.Y. 2006).

## II.  Scienter

Plaintiffs' Section 10(b), 14(a), and 11 claims fail for the independent reason that they do not meet the heightened standard for pleading scienter, particularly with respect to the alleged omission regarding the lapse of the NanoWeb patent.[18] Because the alleged omission regarding the NanoWeb patent lapse is the closest Plaintiffs come to pleading an actionable omission for the purposes of their claims, I limit my analysis of scienter to this allegation.

### A.  Legal Standard

Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2); see also Federal Rule of Civil Procedure 9(b) ("[A] party must state with particularity the circumstances constituting fraud."). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) (alterations and emphasis in original)). The requisite state of mind is "an intent to deceive, manipulate or

---

[18] The PSLRA's heightened standard for pleading scienter applies to Exchange Act claims that sound in fraud, as Plaintiffs' 14(a) claims do here. See In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) ("When plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements . . . even if they disclaim reliance on a fraud theory."). Additionally, when Section 11 claims "sound in fraud . . . the scienter requirements of Rule 9(b) . . . apply." In re Morgan Stanley, 2006 WL 1008138, at *6 n.12. Though the analyses under the PSLRA and Rule 9(b) may not be precisely coextensive, courts have treated the two inquiries together. See In re JP Morgan, 363 F. Supp. 2d at 635-36. As such, I find that Plaintiffs have failed to plead scienter under Rule 9(b) for the purposes of their Section 11 claims for the same reasons that they have failed to do so for the purposes of their other claims.

defraud." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Ganino, 228 F.3d at 168).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI, 493 F.3d at 99. In determining whether Plaintiffs have pleaded facts that present an inference of scienter at least as likely as any opposing inference, I must consider all the alleged facts, taken collectively, "'not whether any individual allegation, scrutinized in isolation, meets that standard.'" S. Cherry St., LLC v. Hennessee, 573 F.3d 98, 111 (2d Cir. 2009) (quoting Tellabs, 551 U.S. at 323).

### B. Motive and Opportunity

To raise a strong inference of scienter through "motive and opportunity" to defraud, Plaintiffs must allege that Defendants "benefitted in some concrete and personal way from the purported fraud." ECA, 553 F.3d at 198 (citation omitted). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." Id.

Plaintiffs fail to plead a concrete personal benefit as to any of the Individual Defendants. To begin with, the Amended Complaint does not allege a motive for Rice or Palikaras. Plaintiffs argue in their opposition, however, that Palikaras "secured a public listing on a U.S. national exchange, thereby instantaneously increasing the liquidity and value of his shares in Metamaterial." (Opp'n 33 (citing Compl. ¶¶ 206-09).) As to Brda, the merger allegedly enabled him to secure payment of his "'accrue[d] unpaid' salary" (i.e., salary he had already earned), a cash bonus, and early vesting of in-the-money stock options. (Compl. ¶¶ 192-98.) As to McCabe,

44

Plaintiffs allege the merger provided him with an "exit strategy" for his investment in Torchlight and the right to dispose of Torchlight's legacy oil and gas assets. (Id. ¶¶ 199-203.)

The alleged motive as to Brda is insufficient to plead scienter because "[g]eneral allegations that the defendants acted in their economic self-interest are not enough" to plead motive. Ganino, 228 F.3d at 170. The Second Circuit has also held that the motive to protect executive compensation is "too generalized to demonstrate scienter" as it is "common to all corporate executives." Kalnit, 264 F.3d at 139. Similarly, the benefits to McCabe and Palikaras (the right to legacy gas and oil assets and shares in a NASDAQ-listed company, respectively) inured to all Torchlight and Metamaterial shareholders. And while "the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit," ECA, 553 F.3d at 198, Plaintiffs do not allege that any Individual Defendant sold a single share of Meta since the merger.

### C. Conscious Misbehavior or Recklessness

Having failed to plead motive and opportunity, Plaintiffs bear a "'correspondingly greater'" burden in alleging conscious misbehavior or recklessness. ECA, 553 F.3d at 198-99 (citing Kalnit, 264 F.3d at 142). Conscious misbehavior is "deliberate illegal behavior." Novak, 216 F.3d at 308. Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry St., 573 F.3d at 109 (citation and emphasis omitted). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (citation omitted). "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 574 (S.D.N.Y. 2014) (citation omitted).

To meet their burden, Plaintiffs rely on allegations concerning: (1) a confidential witness, (2) the Individual Defendants' alleged access to internal documents like the Lockheed Martin contract, and (3) the core operations doctrine. (Opp'n 31-33.) None of Plaintiffs' theories is availing with respect to the sole arguably misleading omission regarding the lapse of the NanoWeb patent. First, Plaintiffs rely on allegations from a confidential witness, FE1, who confirmed that Meta did not have the ability to manufacture products at commercial levels during the Class Period. (Compl. ¶ 61.) FE1 also allegedly confirmed that Palikaras and Rice visited the production floor at the facility in which he worked and therefore knew about Meta's production limitations, although the allegations do not specify whether FE1 interacted with the officers. (Id. ¶ 185.) The FE1 allegations are insufficient to raise an inference of scienter as to the alleged NanoWeb patent omission because, as analyzed in the prior section, Defendants adequately disclosed the Canadian facility's production limitations. See supra.

Second, Plaintiffs do not identify specific internal reports confirming the individual Defendants' knowledge of the NanoWeb patent lapse. Courts may not infer scienter "solely from the fact that, due to the defendants' board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information." In re Winstar Commc'ns., No. 01-cv-3014 (GBD), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006). Instead, courts require "specific allegations of various reasonably available facts, or red flags, that should have put the officers on notice that the public statements were false." In re Refco, 503 F. Supp. 2d at 649 (internal quotation marks and citation omitted); see also SafeNet, Inc., 645 F. Supp. 2d at 233-34 (declining to infer scienter from individual defendants' positions within the company where plaintiffs did not point to defendants' access to specific information contradicting their public statements). Here, the only alleged internal document identified in Plaintiffs' opposition is

46

the contract with Lockheed Martin, (Opp'n 32), but as noted previously, the contract does not contradict Defendants' statement that it "partnered" with Lockheed Martin in the colloquial sense, and, in any event, it does not shed any light on the alleged NanoWeb omission, the subject of this scienter analysis.

Finally, Plaintiffs cannot rely on the core operations doctrine because courts have generally found that it does not provide an independent basis for scienter. The "core operations doctrine" provides that plaintiffs who "plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent, or should have been apparent" can rely on "an inference . . . that high-level officers and directors had knowledge of those facts by virtue of their positions within the company." Zheng v. Pingtan Marine Enter. Ltd., 379 F. Supp. 3d 164, 181 (E.D.N.Y. 2019). "The Second Circuit has not expressly determined if the 'core operations' doctrine remains applicable to provide scienter after the enactment of the PSLRA." Francisco v. Abengoa, S.A., 559 F. Supp. 3d 286, 320 (S.D.N.Y. 2021) (citing Frederick v. Mechel OAO, 475 F. App'x 353, 356 & n.5 (2d Cir. 2012) (summary order) ("[W]e have not yet expressly addressed whether, and in what form, the 'core operations' doctrine survives as a viable theory of scienter")). Even in cases where courts have applied the doctrine, judges have found that it "may provide support for but not an independent basis of scienter." Lipow v. Net1 UEPS Techs., Inc., 131 F. Supp. 3d 144, 163 n.11 (S.D.N.Y. 2015) (collecting cases). Thus, even if I determined that the aspects of Meta's business about which Defendants spoke were sufficiently "core" to the company's business, the theory fails because there are insufficient allegations supporting scienter for the doctrine to supplement. See Sachsenberg v. IRSA Inversiones Y Representaciones Sociedad Anónima, 339 F. Supp. 3d 169, 184 (S.D.N.Y. 2018) ("Therefore,

without other evidence of conscious misbehavior or recklessness, Plaintiff cannot exclusively rely on the 'core operations' doctrine to save his claim.").[19]

### D. Corporate Scienter

Plaintiffs do not appear to specifically contest Defendants' argument that Meta lacked corporate scienter, (see Reply 19), but to the extent they advance a "bet the company" theory of motive, such a theory would be insufficient as a matter of law. See, e.g., Chembio, 586 F. Supp. 3d at 220 (rejecting plaintiffs' "'bet the company' theory that . . . [the company's] fate was dependent on the Test's success to a degree that should satisfy motive"); SEC v. Yorkville Advisors, LLC, 305 F. Supp. 3d 486, 513 (S.D.N.Y. 2018) (holding insufficient as a matter of law motive allegations that company "was caught in a death spiral" and "was both hemorrhaging current investor money and was also not attracting sufficient new money").

Plaintiffs also cannot impute scienter to Meta based on the Individual Defendants' scienter. See In re Skechers USA, Inc. Sec. Litig., 444 F. Supp. 3d 498, 529 (S.D.N.Y. 2020) (no corporate scienter where plaintiffs did not adequately plead scienter as to any individual defendant). Nor have Plaintiffs pleaded facts sufficient for me to determine an alleged misstatement's falsity is so "dramatic" that "collective corporate scienter may be inferred." Jackson v. Abernathy, 960 F.3d 94, 99 (2d Cir. 2020). Accordingly, Plaintiffs have not pleaded scienter as to any Defendant.[20]

---

[19] In a filing dated August 2, 2023 (D.E. # 58), Plaintiffs request that I take judicial notice of Wells Notices issued by the SEC Enforcement Division to Meta, Brda, and Palikaras and argue that these notices strengthen the inference for scienter, citing Set Capital LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 79 & n.58 (2d Cir. 2021). While it is true that an SEC investigation can help support a finding of scienter, the Second Circuit in that case noted that it agreed with the defendant that the SEC investigation could not "independently raise[] a compelling inference of manipulative intent" and that it instead viewed the investigation "principally as supporting culpable inferences drawn from stronger allegations" the court had previously examined. Id. at 81. This investigation is not "independently sufficient" for a finding of scienter; instead, it is "one piece of the puzzle." Id. at 79 & n.58, 81 (citing In re Gentiva Sec. Litig., 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013)). In the absence of "stronger allegations," the Wells Notices are insufficient for me to find conscious misbehavior or recklessness.

[20] Because Plaintiffs have not adequately alleged (1) an actionable misstatement or omission, or (2) scienter, I need not address Defendants' additional bases for dismissal.

## CONCLUSION

For the reasons set forth herein, Defendants' motion to dismiss is GRANTED.

SO ORDERED.

Dated: September 29, 2023
Brooklyn, New York

Carol Bagley Amon
United States District Judge